11-51, City of DeKalb v. Johnson-Senten Good morning, Your Honors. Bernie Weiler on behalf of the City of DeKalb. The City of DeKalb appeals this matter as it believes that the decisions of the Commission and the Circuit Court on the issues of accident and causal connection were against the manifest way to the evidence as were some determinations as to the relatedness of certain medical expenses and the amount of impairment under 8D2. With regard to this accident, the purpose of the Act, of course, is to protect the employees that risks that are inherent in their employment and that they must arise as a out of or in the course of employment. And those injuries that, those risks that are encountered in employment in order to be causally connected or to be regarded as compensable must be peculiar to the work and not a risk to which members of the general public are equally exposed. In this case, we believe that the determination of the Commission was against the manifest way to the evidence on the basis of injury. It is clear that the employee had, since 2000, since 1999, had various medical treatment relating to her neck, which was degenerative in nature, and none of those visits up until October of 2007 in any way implicated her working condition. She said that she was a, she's been an employee of the City of DeKalb in their dispatching center in which she answers calls, and she's been doing that for about 23 years. With regard to the conditions of her employment, it was unrebutted that her working conditions placed her at a council that was 48 inches wide and that had a number of monitors, which the ones to which she referred most frequently were at eye level. There were other monitors which captured emergency information which were not constantly monitored, and when the information comes into that monitor, it can be brought down to the monitors in front of her. The council is adjustable so that it can be elevated, the council itself can be elevated and lowered, as well as her chair and as well as the level of the keyboard which she uses. There is a second keyboard which she uses only once per day to log into the system, and the other keyboard is in front of her. Any phone calls that she answers are answered with a headset. So with regard to that, we believe that there's really, and her testimony with regard to what do you have to do, what motions do you make relative to monitoring these computer terminals or computer monitors, was that she turned her, would have to turn her head 45 degrees, and that would be found at page 46 and 47 of the transcript. That 45 degrees is about what I'm turning my head right now. I mean, I understand the basic argument and the premise. It's well settled that for an injury to arise out of somebody's employment, the risk either has to be a risk to which the public is generally not exposed. That's peculiar to the work, and I think you've answered that. Right. But there's a second part of the case law. It has to be a risk to which the general public is exposed, but the employee is exposed to a greater degree, and I think that's what they're hanging their head in. Okay, we all turn our heads frequently in the course of a day, but her job requires her to turn her head very frequently. It's that repetitive motion that's the basis for the claim. So how do you argue the commission erred in light of that doctrine? Well, and then with regard to that, in a repetitive motion case, those cases are proved by medical evidence that establishes the cause of connection between the conditions of work and the injury. And in this case, the only evidence in support of that was Dr. Vance's evidence deposition in which he acknowledges that he knew that she was a dispatcher, but when he gave his original opinion on cross-examination, he said, I didn't know anything about her condition. I don't know the extent to which she rotated her head. He said that I never asked her about the actual conditions of her job. I've never asked her what the counsel that she looked at, she sat at, looked at. He never saw a picture of it. He never reviewed her job description. And that is so that the foundation for that opinion must be based upon fact. And so what the city objects to is the causal connection that would create in a repetitive trauma case the fact that this was indeed a risk that was greater than that to which the general public was exposed. How would you respond to this argument? No one delineated apparently the number of times typically in the course of a day. We'd have to ask Mr. Turner that. But it appears that Van was at least aware when he gave his opinion that it involved a lot of the claimant's work was related to turning, neck rotation, and flexion. So he certainly knew that she was turning quite a bit. He didn't get a number. He did not get a number. And we believe that under cases such as Darling that the definition, those definitions must be part of the factual foundation for his opinion in order for that opinion to be valid rather than guess or conjecture. And with respect to that, Dr. Van, the only time that he ever said anything about rotation was in response to a hypothetical question which was asked on a redirect examination at his evidence deposition. And he said the facts that were given in that hypothetical was that she had to monitor computer screens that were at different angles and heights. Now, even she doesn't say that she was elevating her head back and forth. So the head is irrelevant. The height of the monitor is irrelevant. And he really never defined and was never provided in that hypothetical with how far do you have to look. Now, the other evidence, the evidence that was introduced by the supervisor was that all of these monitors are situated in such a way that you can actually see and monitor them by glancing back and forth and by very, very minimal turning of the head or neck and by rotating your chair, not your neck. So there was nothing that Dr. Van was ever supplied with that said that in monitoring these monitors that she was ever required to rotate her neck. He made that leap from the fact that she had to monitor these things that were at different angles without specifying as to what they were, what those angles were, and then made that connection, well, there must be a great deal of rotation. And the only way that he supported his causal connection was to say that, well, she had radicular pain, which was distinct, between the time that I saw her in October of 2007 and the time that I saw her in November of 2007. So something must have happened, that there is no other trauma. And so that sort of shifts the burden of proof in which we have objected to the shifting of the burden of proof that says that, well, because there was no other trauma, it must be. Now, if there were other facts that led in a circumstantial chain, the lack of some other accident or occurrence might be a link in a circumstantial chain, but there's no such circumstantial chain here. It was, well, she's a dispatcher. I was given this hypothetical question, which doesn't fill in exactly what you do. And by that, I assume and I speculate and I conjecture that she must be rotating her head very frequently. And there's nothing in the record that shows the quantification as to how that she does that. On the other hand, Dr. Butler testified that he questioned her thoroughly about the conditions of her employment and the extent to which she has movement, that he reviewed the workstation, that he looked at the job description and did a very, very thorough analysis of the facts that were presented to him about that. And his determination was that these types of actions do not subject her to any further risk than would be common to the general public. Well, obviously, the Commission accepted Dr. Vance's testimony. That's correct. Can you respond to this question that if you asked us to discount Vance's testimony, that the Commission found to be credible and believable, that we would be running afoul of the principle we are not supposed to substitute our judgment on matters of weight and credibility? That's within the province of the Commission, and you're inviting us to do that. Well, I'm not exactly inviting you to do that because, and I agree that manifest weight, that there must be a different result that is apparent. But in reaching the conclusion of manifest weight, and this was pointed out in this Court's recent opinion in the Tower Automotive case, which says the test for that is not whether or not a different conclusion would be reached, but whether or not there is sufficient evidence in the record to support the opinions that were expressed by the Commission or the determination that was reached by the determination, this is not, there is always a manifest weight standard. And we never invite the Court, the Court is not always invited to substitute a judgment for another, but the role in looking at whether or not there is a manifest, whether or not something meets the manifest weight of the evidence is whether or not there is anything in the record that supports that opinion. In this case, we say that. Mr. Turner is going to say Vann's opinion. Pardon me? Mr. Turner, I anticipate, is going to say Vann's opinion. Yes. And I would agree. But under Hussain v. Patel, that opinion must have factual foundation. And here there is no factual foundation. It's all that he knew is that he was a dispatcher. He didn't. He admits in his cross-examination that he never asked her and never considered that. And then we get a hypothetical question to which there was an objection to foundation that was made that does not supply really anything that is substantial as to what these actions really were. So we would say that there was nothing within that foundation, that just because he has that opinion, that opinion must be based upon factual, upon actual facts that support that opinion. And we would think that that was not correct. Does Wilson v. Clark apply to workers' compensation cases? Wilson v. Clark, I believe, does apply to all that is evidently a principle. The only thing he has to do is give his opinion. Pardon me? He only has to give his opinion, and then it becomes the obligation of the cross-examiner to detract from that opinion through cross-examination, and it goes away, unless, of course, he says he did it by reference to, let's say, an examination of the entrails of chickens, in which case you move to strike it. Right. As being totally baseless. So there's no motion to strike it in this case. So the only thing that happened on cross-examination is you attack the weight, but the commission is the one that determines weight. Well, I don't know that that just attacked the weight. It attacked the foundation of his opinion. He says I have this opinion, and on cross-examination it was established that his opinion was not based upon facts which would base, upon which he could base a conclusion that what she was doing at her work was anything other than what people would normally do. Your time is up. You'll have time for rebuttal. Counsel, please. Thank you. May it please the Court. Mr. Weiler, respectfully, with all due respect to Mr. Weiler, as this Court said in Tower Automotive a year ago, distilled to their finest, the Respondent's arguments on these issues are nothing more than arguments of credibility and weight. In that case, there were two physician opinions for the Respondent that contradicted a treating doctor's position. In that case, the Respondent made the same argument that the Respondent makes here. That is, this doctor's opinion, Dr. in that case Scheibel's opinion, you really should ignore that because it's not founded, shouldn't be relied on because it was rendered in excess of a year after the claimant began treating with him for this cervical degenerative condition, the Respondent called it, and because the Respondent in that case really didn't have a full understanding of the forklift operator's jobs in that decision, how frequently the forklift operator turned his neck back and forth as he operated as a material handler. That's the same argument that the Respondent's making in this case. And it really distilled, as this Court said last year, distilled to it, that's all it is is credibility and weight. Dr. Vann, in addition, there's two other reasons why, even more than in Tower in this case, this Court should affirm the decision of the Commission. Number one, Dr. Vann treated this patient both before and after. There was an MRI from 2005 of the cervical neck. There was an MRI from October, I'm sorry, November 20th of 2007. And he said, this really made this clear cut for me. I've been treating this patient for both before the exposure and after the exposure. There's a clear cervical disc herniation observable in the November 2007 MRI that wasn't there. Now, granted, he didn't get into, you know, he didn't review a four- or five-page job description for this employee, but he did have the benefit of having talked with her, knowing what her job was, and a description that her job involved flexion and extension of the neck and repeated side-to-side movement of the neck. And more so to address the question you raised, Justice Hudson, which is, well, do we have any frequency? I believe she testified, if I'm not mistaken, she said about 60 percent of her time, she spent either doing the keyboard operations involving the repetitive entry of data and watching the screens or the side-to-side movement. The other thing is that this isn't just somebody who's, you know, a security guard watching monitors. This is someone who had to rapidly respond in emergency situations and quickly move to respond to those situations. These dispatchers in the city of DeKalb respond to both police and fire. And they're also, they're multitasking doing other jobs. In addition to even doing paperwork, requiring her to reach behind her, grab these binders, enter data in the binders. So she's doing this constantly during the course of the day. The second reason is that in this case, as the commission found, the arbitrator had the benefit of actually going downstairs from the hearing room in the city of DeKalb, walking down the stairs, going into the dispatch room and spending some time actually observing the dispatcher, another dispatcher, in the course of her employment, looking at the screens, getting a full, as he said, you know, a full 360-degree view of the room and being in a position to observe those job activities. So for those reasons, I think that there's more than enough here in terms of evidence to justify the commission's decision. I would submit to this Court that there's not enough here. There's nothing here that says that there's an absence of any basis on the part of the commission for it to enter its decision. And for that reason, we request, respect the request that you affirm the decisions below. Thank you. Thank you, fellow. With regard to the Tower of Record case that was upon which plaintiff or petitioner relies, it is clear in that case that the physician who rendered that opinion was supplied with a great deal of information about how that accident, you know, how those job actions placed that person in very unusual conditions, that there was indeed rotation, that there was extreme rotation, that he had to look behind him so that he didn't run people over backwards while operating. I'm sorry, that wasn't the court case. Mr. Weiler, was that physician, was that a treating physician? Pardon me? The physician you're referring to in Tower, was that the treating physician or somebody else that was brought in? In Tower. With regard to, I believe Tower was, yeah, it was the treating physician. Okay. That they relied on and that there was jolting, that there was bumping, that there was actually twisting. Here, Dr. Vann had no information to show what the actual body mechanics were. He said this is what she had to do, but didn't have any idea of the extent, he leapt to the fact that there was rotation. And that he leapt to the fact that because she didn't have it a month ago and she has it now, and now that the herniation occurs, and I believe it occurred within that month because of the radiation down to the arm, which the medical records show that there was referred pain long before that, that therefore there must be a relationship between this. So I think that the Tower records and the Darling case where there was, where the petitioner was, it was a manifest weight case and the court said, well, we have information that this person works over his head and he exerts pressure and he turns and that the symptomatology happens contemporaneously exactly with that motion. And so that we knew that those physicians knew the mechanics of that injury. We don't believe that Dr. Vann did. And that we would also indicate that when Dr. Vann also says at the end that after the surgery that she was fantastic and that she did have some, that the pain that she had was really the same that she had prior to the occurrence. And that he didn't know why she was experiencing that pain. So we believe that when she, after the post-surgery, she went back to work without restrictions, went back to doing everything that she was doing and she went back to feeling the way she was feeling before that event, which Dr. Vann says is the only event which he relates to the accident. So we believe that under 8D2 that there is not the level of impairment that the industrial commission reached. And that the 30 percent of a man of a whole is excessive. And I believe in the brief that the suggestion was that a 20 percent man of a whole is more in line with Darling where the symptoms were much greater post-surgery. Thank you, counsel. Nothing further. The court will take the matter under driver for disposition.